**In re Ralph Carl JEPPSON and Vicky Lynn Broadbent Jeppson, Debtors.**

**Bankruptcy No. 84C–00380.**

United States Bankruptcy Court, D. Utah.

Aug. 15, 1986.

George W. Pratt, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for First Interstate Bank of Utah, N.A.

Gerald S. Wight, Vlahos, Perkins & Sharp, Ogden, Utah, for debtors.

### MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

This matter came before the Court on the hearing to confirm the plan of reorganization filed by First Interstate Bank of Utah, N.A. ("First Interstate"), a secured creditor of the debtors. First Interstate did not submit and obtain Court approval of a disclosure statement and did not solicit acceptances or rejections of its plan from holders of claims and interests. The issue in this case is whether First Interstate's plan of reorganization is confirmable. This Court concludes that it is not.

### FACTS AND PROCEDURAL BACKGROUND

The debtors, Ralph and Vicky Jeppson, own and operate a dairy farm. First Interstate is the debtors' largest secured creditor, with a lien on the debtors' real property and livestock to secure payment of approximately $273,000.00. First Interstate loaned the debtors substantial sums of money to enlarge their dairy operation, but when it refused to advance additional funds sufficient to increase the size of their cattle herd, the debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code. On January 3, 1985, eleven months after the commencement of the case, the debtors filed a disclosure statement and plan of reorganization. The Court approved the debtors' disclosure statement as containing adequate information, with certain modifications, at a hearing on February 7, 1985. Since that time, the debtors have not submitted their disclosure statement and plan, together with ballots, to parties entitled to vote.

On April 10, 1985, First Interstate filed a plan of reorganization and a paper entitled "Acceptance by First Interstate Bank of Utah, N.A. of the Plan Proposed by First Interstate Bank of Utah," and scheduled a confirmation hearing. First Interstate had not previously obtained Court approval of a disclosure statement, and did not solicit votes on its plan. Copies of the plan were sent to all parties in interest at that time. Notice was also sent to all parties in interest advising them that they could file objections to the plan prior to the confirmation hearing. No ballots were sent to parties in interest.

First Interstate's plan provided that upon confirmation a member of the Court's standing panel of Chapter 7 trustees would be appointed trustee and charged with liquidating the property of the estate. Creditors with secured claims were to be paid from proceeds from the sale of their collateral. In the event the liquidating trustee failed to sell sufficient property to satisfy all creditors' claims in full within four months from his appointment, the plan required him to conduct a "cash only" auction sale during the fifth month.[1] All

---

1. First Interstate's plan, in substance, amounts to a conversion to Chapter 7. Liquidating plans such as this are being sponsored by creditors with increasing frequency. *See generally* Anderson & Wright, *Liquidating Plans of Reorganization*, 56 Am.Bankr.L.J. 29–54 (1982). At the confirmation hearing, the debtors did not argue that a farmer who has filed a voluntary Chapter 11 petition cannot be forced to liquidate under a creditor's liquidating plan. There presently is a split of authority on this question. *Compare In re Button Hook Cattle Co.,* 747 F.2d 483, 12 B.C.D. 738, Bankr.L.Rep. (CCH) ¶ 70,-117, 11 C.B.C.2d 760 (8th Cir.1984); *In re Jasik,* 727 F.2d 1379, Bankr.L.Rep. (CCH) ¶ 69,782, 10 C.B.C.2d 361 (5th Cir.), *rehearing denied sub*

classes of claims are impaired under the plan.

At the confirmation hearing, an employee in the Loan Recovery Division of First Interstate Bank responsible for the debtors' loans testified concerning the requirements of Section 1129. The balance of the hearing consisted of the legal arguments of the parties. Counsel for First Interstate argued that "if voting is going to be essentially meaningless within the context of a particular plan, no solicitation need be made and no disclosure statement is required." [2] First Interstate characterized its own acceptance as a permissible "unsolicited acceptance." Counsel for the bank further argued that the disclosure statement approval and plan balloting process were meaningless exercises in the context of this case since it could "cram down" its liquidating plan over the dissenting votes of the debtor and *all* other creditors.[3] Counsel for the debtors argued that under First Interstate's view, Section 1125 would be reduced to "mere surplusage," and that the requirements of an approved disclosure statement and the opportunity to vote on a plan are creditors' rights vouchsafed by the Bankruptcy Code.

The Court is called upon to decide whether or not a creditor which files a liquidating plan may dispense with the requirement under Section 1125(b) of filing and obtaining court approval of a disclosure statement and of soliciting votes from creditors. This case raises an important issue concerning the construction of Section 1125 of the Bankruptcy Code and its relationship to Section 1126 and Bankruptcy Rules 3016(c), 3017(a), and 3018(a). To resolve this matter the Court shall first look to the historical development of reorganization procedure in the United States.[4]

## DISCUSSION

### I.

### *The Reorganization Context*

Until the enactment in 1933 and 1934 of Sections 77[5] and 77B[6] of the Bankruptcy Act, there was no statutory machinery generally available to facilitate the reorganization of insolvent corporations.[7] The Bankruptcy Act of 1898 had concerned itself almost entirely with liquidation of the debtor's assets and distribution of the proceeds among creditors, devoting approximately 72 sections to that aspect.[8]

Composition and extension agreements, by which a debtor agreed in return for a release from further liability to pay his

---

*nom. Jasik v. Conrad,* 731 F.2d 888 (5th Cir. 1984); *In re J.F. Toner & Sons, Inc.,* 40 B.R. 461, 12 B.C.D. 409, 11 C.B.C.2d 1010 (Bkrtcy.W.D.Va. 1984); *and In re Tinsley,* 36 B.R. 807, 11 B.C.D. 779, 10 C.B.C.2d 27 (Bkrtcy.W.D.Ky.1984), *with In re Smeltzer,* 47 B.R. 77 (Bkrtcy.W.D.Wis. 1985); *In re Kehn Ranch,* 41 B.R. 832, 12 B.C.D. 258, 11 C.B.C.2d 289 (Bkrtcy.D.S.D.1984); *In re Lange,* 39 B.R. 483 (Bkrtcy.D.Kan.1984); *and In re Blanton Smith Corp,* 7 B.R. 410, 6 B.C.D. 1389, Bank.L.Rep. (CCH) ¶ 67,713, 3 C.B.C.2d 358 (Bkrtcy.M.D.Tenn.1980). *See* Note, *Bankruptcy Law and the Farmer: Are Farmers Really Exempt from Forced Liquidation Under Chapter 11?,* 25 Washburn L.J. 264–275 (1986). This Court anticipated but did not decide this issue in *In re Curlew Valley Associates,* 14 B.R. 506, 508 n. 2, 8 B.C.D. 495, Bankr.L.Rep. (CCH) ¶ 68,414, 5 C.B.C.2d 255 (Bkrtcy.D.Utah 1981).

**2.** Transcript of hearing at 28.

**3.** *Id.* at 17–18.

**4.** "Any highly developed social, legal, or economic procedure has its roots in historical incidents, many of them apparently unimportant at the time of their occurrence yet very important in terms of historical evolution. This is true of corporate reorganization." 2 A. Dewing, THE FINANCIAL POLICY OF CORPORATIONS 1237 (5th ed. 1953).

**5.** Act of March 3, 1933, Pub.L. No. 72–420, 47 Stat. 1474, ch. 204, codified at 11 U.S.C. § 205 (repealed).

**6.** Act of June 7, 1934, Pub.L. No. 73–296, 48 Stat. 912, ch. 424, codified at 11 U.S.C. § 207 (repealed).

**7.** Securities and Exchange Commission, REPORT ON THE STUDY AND INVESTIGATION OF THE WORK, ACTIVITIES, PERSONNEL AND FUNCTIONS OF PROTECTIVE COMMITTEES, Part VIII, at 5 (1940) (hereinafter "PROTECTIVE COMMITTEE REPORT").

**8.** *See* Mulder, *Ambiguities in the Chandler Act,* 89 U.Pa.L.Rev. 10, 13 (1940).

creditors a certain percentage of their claims, were frequently used as substitutes for bankruptcy liquidations. A composition provided for immediate payment to creditors of a reduced amount, while an extension normally provided for deferred but full payment. These common law "workouts" were binding only upon assenting creditors.[9]

Some commercial debtors avoided bankruptcy by turning over their assets to an assignee under a general assignment for the benefit of creditors. A general assignment was a voluntary act of a debtor, whereby he transferred all of his assets to another person in trust to distribute among his creditors with such delay only as may be incident to liquidation.[10] While some assignments operated successfully, many did not. The proceedings did not provide sufficient protection for either debtors or creditors. No discharge could be granted, and the debtor was only released from the claims of consenting creditors. Uncooperative creditors were in a position to threaten to institute involuntary bankruptcy proceedings in order to coerce the debtor or assignee to settle their claims favorably.[11] Bankruptcy also gave greater protection to creditors because in the course of the proceedings they were given the opportunity to examine the debtor and any fraudulent transfers or concealment of assets could be discovered.[12]

The evolution of composition procedure in the nineteenth century culminated with Section 12 of the Bankruptcy Act of 1898.[13] Under this section, the debtor could make an offer to all his unsecured creditors for the satisfaction of their claims by payment in part of such claims. If the holders of a majority in number and amount of claims accepted the offer, and if the court found that it was in the best interests of the creditors that the offer be accepted, all creditors were bound to accept the payments provided in the composition agreement in full satisfaction of their claims.[14] The theory of the composition was simple: If a majority of the creditors wished to avoid the risks of liquidation in bankruptcy, and if all creditors would receive at least as much on their claims under the composition agreement as they would receive in liquidation, a minority of creditors would not be allowed to insist on an immediate sale of the debtor's property.[15] The Court could compel dissenters to accept the debtor's offer, "or rather, treat them for all purposes as though they had." [16] This early "cramdown" provision was plainly in derogation of the common law rule that compositions were binding only upon assenting creditors [17] and marks a turning point in reorganization law. "One of the most important innovations in American reorganization law is the concept that creditors by majority vote can force nonconsenting creditors to accept less than full payment of their debt." [18]

**9.** Comment, *Bankruptcy Reform and the Chandler Bill*, 46 Yale L.J. 1177, 1180 (1937). *Cf.* G. Glenn, LIQUIDATION § 89, at 149 (1935).

**10.** G. Glenn, *supra* note 9, at § 105.

**11.** *Bankruptcy Reform and the Chandler Bill*, *supra* note 9, at 1185–86.

**12.** G. Glenn, *supra* note 9, at § 119.

**13.** Act of July 1, 1898, § 12, 30 Stat. 549, codified at 11 U.S.C. § 30 (repealed). *See* G. Glenn, *supra* note 9, at § 376.

**14.** *See Meyers v. International Trust Co.,* 273 U.S. 380, 383, 47 S.Ct. 372, 374, 71 L.Ed. 692 (1926); *In re Leight & Co.,* 139 F.2d 313, 315 (7th Cir.1943); *In re Goldberg,* 97 F.Supp. 75, 76 (S.D.N.Y.1951). *See generally* PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 72–74.

**15.** Gerdes, *General Principles of Plans of Corporate Reorganization,* 89 U.Pa.L.Rev. 39, 43–44 (1940). *See generally* G. Glenn, *supra* note 9, at §§ 376–386.

**16.** G. Glenn, *supra* note 9, at § 378. *See Cumberland Glass Mfg. Co. v. DeWitt,* 237 U.S. 447, 452–53, 35 S.Ct. 636, 438, 59 L.Ed. 1042 (1915).

**17.** *See Matter of Kinnane Co.,* 221 F. 762, 766 (D.Ohio 1915); *Matter of Goldstein,* 213 F. 115, 116 (D.Conn.1914); *In re Frear,* 120 F. 978, 980–81 (N.D.N.Y.1903); *In re Rider,* 96 F. 808, 809 (N.D.N.Y.1899).

**18.** Trost, *Business Reorganization Under Chapter 11 of the Bankruptcy Code,* 34 Bus.Law 1309, 1328 (1979).

Although the constitutionality of compositions was upheld,[19] Section 12 was not used extensively. Section 12 was not designed for and in practice was seldom used to effect corporate reorganization. It was designed as a substitute for liquidation in small cases.

The very paucity of detail in Section 12, the town meeting technique of unlimited creditor control, the failure to provide specifically for secured creditors, the omission to provide especially for stockholders, the neglect of distinction between various classes of creditors, and the failure to recognize the possible existence of holders of corporate securities of the debtor or of any likelihood of committees representing their interests—all bore witness to the restricted purview of this section, as applying only to the small, personal enterprise.[20]

On March 3, 1933, Congress added a new Section 74 to the Bankruptcy Act, entitled "Compositions and Extensions,"[21] which largely supplanted Section 12. However, Section 12 was not repealed when Section 74 was adopted, and both remained in existence until replaced by Chapter XI of the Chandler Act.[22] Section 74 had several advantages for debtors over Section 12: .(1) the debtor was not adjudged or designated a "bankrupt" unless confirmation of his proposal was denied, or unless the proceeding was commenced for the purpose of delaying creditors; (2) a bankruptcy referee could confirm the debtor's proposal, thus avoiding the serious delays under the former procedure, which required the district judge to confirm the proposal; (3) the debtor could offer his creditors, as an alternative to a composition, a proposal for an "extension" in the nature of a moratorium, which unlike a composition under Section 12, could affect secured as well as unsecured debt, and all types of contingent claims; and (4) future rent claims were expressly made provable and, therefore, dischargeable.[23] The advantages for creditors were (1) that they could vote more intelligently on the debtor's proposal because Section 74 required that the debtor's proposal be accompanied by more information than that required under Section 12; and (2) the proceedings were more expeditious, and the danger of losses attributed to delay was less.

Prior to the enactment of Sections 77 and 77B, the law of corporate reorganization was gradually evolving, primarily in equity receivership cases.[24] Reorganization procedure originated in railroad cases, where the fact that railroads were ineligible to become bankrupts, combined with the public interest in their continued operation, made unsuitable the normal processes for enforcement of creditors' claims by piecemeal execution sales of the debtor's property. A financially troubled railroad generally could not be liquidated for more than a small fraction of its actual value. "[I]t [was] too big to sell in one piece and too integrated to break into smaller units."[25] State court procedures were generally inadequate due to territorial limits of their jur-

19. *See Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P.R. Co.,* 294 U.S. 648, 675, 55 S.Ct. 595, 605–04, 79 L.Ed. 1110 (1935); *Cumberland Glass Mfg. Co. v. DeWitt,* 237 U.S. at 447, 35 S.Ct. at 636.

20. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 74.

21. Act of March 3, 1933, Pub.L. No. 72–420, 47 Stat. 1467, ch. 204, codified at 11 U.S.C. § 202.

22. Act of June 22, 1938, Pub.L. No. 75–696, 52 Stat. 840, ch. 575 (Preamble). .*See generally* 9 REMINGTON ON BANKRUPTCY § 3565, at 199 & n. 5, § 3582, at 225 (6th ed. J. Henderson 1955).

23. G. Glenn, *supra* note 9, at § 404, n. 28, citing Garrison, *Recent Amendments to the Bankruptcy Act,* 19 A.B.A.J. 330 (1933).

24. *See General Principles of Plans of Corporate Reorganization, supra* note 15, at 40; Note, *The Chandler Bill and Section 77B,* 23 Iowa L.Rev. 402 (1938).

25. Blum, *The Law and Language of Corporate Reorganizations,* 17 U.Chi.L.Rev. 565, 567 (1950).

isdiction and, in many instances, the lack of general equity powers in those courts.[26]

There were no statutes governing federal equity receiverships.[27] In the absence of a statutory apparatus, courts expanded and adapted existing equitable remedies.[28] This was generally achieved by the filing of a creditor's bill.[29] In order to withstand attacks by its smaller creditors and the appointment of a number of receivers by several state courts, a debtor might arrange with one of its creditors holding an overdue claim for the filing of a creditor's bill in the federal district court for any district in which the debtor corporation conducted business. The basis for federal jurisdiction was diversity of citizenship. The creditor's bill requested a determination of the rights of all the debtor's creditors, the ultimate liquidation of its assets for the satisfaction of claims, and, pending the liquidation and disbursement of proceeds, the appointment of a receiver. The debtor would then file an answer, admit the allegations of the bill, and consent to the appointment of a receiver.

The appointment of a receiver in a conventional "consent" or "friendly" receivership was merely incidental relief; the ultimate relief sought by the creditor was the sale of the debtor's assets and distribution of the proceeds to creditors.[30] The creditor's bill conferred on the court the power to enjoin the judgments and executions of creditors and piecemeal litigation which would result in undue preferences among creditors.[31] Receivers could be appointed either to carry on the business of a corporation with a view to the continuation of its corporate life, or to aid in the dissolution of the corporation and the liquidation of its business.[32] In theory, the creditor's bill sought the appointment of a receiver as the guardian of the debtor's assets, to conserve them in anticipation of the liquidation which would give the creditor the relief prayed for in the bill. In practice, however, the object was not liquidation but reorganization, and the receiver was no mere conservator of assets but an active administrator whose primary function was to preserve the business as a going concern.[33] As a result, the federal equity receivership, originally designed as a remedy in aid of execution after judgment, which afforded a means of marshaling and liquidating the debtor's assets, was adapted to the opposite purpose—the preservation of those assets as a going concern pending readjustment of the rights of creditors and stockholders.[34] These "friendly" or "consent" receiverships predominated large corporate failures prior to enactment of § 77B.[35]

In most cases, however, receivers could not operate the debtor's business profitably so as to pay off its obligations and permit it to operate independently.[36] This was due in significant part to the expense associat-

26. Israels, *Some Problems of Policy and Procedure in the Conduct of Reorganization Proceedings*, 89 U.Pa.L.Rev. 63, 65 (1940).

27. Hunt, *Conflict Between Equity and Bankruptcy Jurisdiction*, 39 Comm.L.J. 383, 387 (1934).

28. PROTECTIVE COMMITTEE REPORT, *supra*, note 7 at 5–6.

29. *Id.* at 24.

30. *See* G. Glenn, *supra* note 9, at § 155; Swaine, *Corporate Reorganization Under the Federal Bankruptcy Power*, 19 Va.L.Rev. 317, 323 (1933). *See also Conflict Between Equity and Bankruptcy Jurisdiction, supra* note 27, at 387; PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 25. The "friendly receivership" was the subject of judicial denunciation. *See, e.g., Harkin v. Brundage*, 276 U.S. 36, 55, 48 S.Ct. 268, 275, 72 L.Ed. 457 (1927); *May Hosiery Mills v. F. & W.*

*Grand 5–10–25 Cent Stores*, 59 F.2d 218, 220–23 (D.Mont.1932), *rev'd* 64 F.2d 450 (9th Cir.1933).

31. *See Harkin v. Brundage*, 276 U.S. at 45, 48 S.Ct. at 271–72.

32. *Michigan v. Michigan Trust Co.*, 286 U.S. 334, 341, 52 S.Ct. 512, 513–14, 76 L.Ed. 1136 (1931).

33. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 31.

34. *Some Problems of Policy and Procedure in the Conduct of Reorganization Proceedings, supra* note 26, at 65.

35. A. Dewing, *supra* note 4, at 1245.

36. Morris, *Equity Receiverships and Bankruptcy*, 9 J.Nat.Ass'n.Ref.Bankr. 68, 69 (1935).

ed with "ancillary receiverships." The most effective administration of an insolvent corporation's estate would result, of course, if the same receiver was appointed in all the districts in which the debtor's assets were located.[37] But there was often doubt whether the district court's jurisdiction reached to other districts in which the debtor's property was located.[38] It therefore became the general practice to file "ancillary bills" in other districts.[39] The ancillary receiver was a receiver appointed in a foreign jurisdiction to assist or act for the primary or principal receiver. Sometimes the primary receiver would be appointed in the foreign jurisdiction as ancillary receiver, but often the foreign court would insist upon a local resident being receiver.[40] Since each receivership involved separate personnel, including receivers, attorneys and accountants, the waste and expense associated with this procedure tended to destroy the value of the business it was intended to preserve.[41]

Although judicial decisions in equity receivership cases had done much to develop the law of corporate reorganization, with the Great Depression in 1929 there came an immediate need for a more definite and specific body of law governing this field.[42] The introduction of Section 77, for railroad reorganizations and Section 77B, for corporate reorganizations, in 1933 and 1934, made reorganizations primarily a matter of bankruptcy law.[43]

Section 77B was enacted in 1933, in the aftermath of the Donovan Report, an investigation of bankruptcy administration in the Southern District of New York. The investigation was conducted by William J. Donovan, representing the three bar associations of New York and Bronx counties, with the Honorable Judge Thomas J. Thatcher presiding at the hearings thereon. The Donovan Report examined the defects of the bankruptcy system and recommended numerous changes.

It was determined that the inefficiency and abuses found prevalent proceeded from two main features, which were not adapted to the changed business conditions. These were: (1) the slow-moving procedural machinery laid down by the Act, and (2) the theory upon which the whole administrative structure rested, namely, that the creditors in each particular case could be relied upon to control, supervise, and successfully manage the conduct of bankruptcy proceedings.

The report recommended: (1) more prompt administration of the law; (2) more simplified procedure and administration; (3) relieving the courts of administrative responsibilities and centralization of such responsibilities in the executive branch of the federal government; (4) limitation of creditor control through committee action to cases where the committees were genuinely interested; (5) the thorough examination of all bankrupts in all cases, permitting trustees to object to discharges; and (6) the strict enforcement of the criminal and discharge provisions of the Act.[44]

37. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 30.

38. The court which first acquired jurisdiction through possession of the debtor's property was vested, while it held possession, with the power to hear and determine all controversies relating thereto. It had the right, while continuing to exercise its prior jurisdiction, to determine for itself how far it would permit any other court to interfere with such possession and jurisdiction. *Lion Bonding and Surety Co. v. Karatz,* 262 U.S. 77, 89, 43 S.Ct. 480, 484, 67 L.Ed. 871 (1923). *See generally* 1 CLARK ON RECEIVERS §§ 280–295 (3d ed. 1959).

39. *Corporate Reorganization Under the Federal Bankruptcy Power, supra* note 30, at 319.

40. *See* 1 CLARK ON RECEIVERS, *supra* note 38, at § 18.

41. *Corporate Reorganization Under the Federal Bankruptcy Power, supra* note 30, at 320–21.

42. *See In re Philadelphia Rapid Transit Co.,* 8 F.Supp. 51, 53 (E.D.Pa.1933) *aff'd* 73 F.2d 1022 (3d Cir.1934).

43. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 36.

44. *Bankruptcy Under the Chandler Act: Background,* 27 Geo.L.J. 194, 198 (1938). *See* H.R. Rep. No. 1409, 75th Cong., 1st Sess. 2–3 (1937).

In the closing hours of the 73d Congress, the Bankruptcy Act was amended to add a provision for the reorganization of corporations, designated as Section 77B.[45] The primary purpose of Section 77B was to remedy the defects of equity receivership practice. Its drafters were familiar with the delays and expense caused by ancillary receivership proceedings, and the problems associated with debtors having to "buy off" intransigent creditors. Section 77B met those fundamental problems. Ancillary receiverships were abolished. The bankruptcy court was given jurisdiction over all of the debtor's property, wherever located. Minorities were bound by the action of two-thirds of the members of their class. Also, the judge was permitted to retain the debtor in possession, thereby eliminating the expense of having a separate receiver or trustee.[46]

Proceedings under Section 77B were initiated by the debtor corporation or by three or more of its creditors holding provable claims aggregating $1,000.00 or more. Jurisdiction was confined to corporations which could be bankrupts under the 1898 Act, excepting railroads and other transportation corporations authorized to file for relief under Section 77, and certain municipally-owned railroad corporations. The fundamental averments required included facts showing the need for relief under the section, that the corporation was insolvent or unable to meet its debts as they matured, and that it desired to effect a plan of reorganization. Another requirement under Section 77B was a statement of reasons why Section 12 of the Bankruptcy Act would not give adequate relief. The purpose of the statement was to give the bankruptcy judge the opportunity to determine whether a reorganization could be successfully accomplished under Section 77B.[47] If all of the corporation's debts were unse-

cured and the debtor was essentially seeking to effect a composition with its creditors, the debtor was required to proceed under Section 12.[48]

The debtor's petition or answer to the creditors' involuntary petition was presented to the bankruptcy judge, who would approve the petition or answer upon a determination of the issues presented by the pleadings, if he was satisfied that the petition was filed in good faith. Upon approving the petition or answer, the court could appoint a trustee or continue the debtor in possession. The court would also fix the time for filing proofs of claims and interests.

A plan of reorganization under Section 77B could be proposed by the debtor or by any creditor or stockholder. If filed by a creditor or stockholder, it had to be first approved by creditors whose claims would be affected by the plan, holding 25 percent in amount of any class and 10 percent in amount of the total of all claims, or, if the debtor had not been found to be insolvent, by stockholders affected by the plan aggregating 10 percent of any class of stock and 5 percent of the total number of outstanding shares of all classes. The plan had to be accepted by creditors holding two-thirds in amount of the claims in each class, unless the court found that the class was not affected by the plan or that provision was made for the dissenters of that class. In addition to approval by the requisite percentages in each class, a plan could not be confirmed unless the court found that it was "fair and equitable" and feasible.

Under Section 77B, the right to submit plans was confined to groups of creditors or stockholders who could muster the support of substantial percentages of their classes.[49] To acquire the required percent-

---

**45.** Act of June 7, 1934, *supra* note 6. *See generally* Kaplan, *Corporate Reorganization Under Section 77B of the Bankruptcy Act,* 33 Mich.L. Rev. 77–93 (1934).

**46.** *See* Gerdes, *Corporate Reorganizations,* 13 J.Nat.Ass'n.Ref.Bankr. 67, 69 (1939).

**47.** Weiner, *Corporate Reorganization: Section 77B of the Bankruptcy Act,* 34 Col.L.Rev. 1173, 1182 (1934).

**48.** *Id.*

**49.** Teton, *Reorganization Revised,* 48 Yale L.J. 573, 591 (1939).

ages, it was normally necessary to form committees. One of the recognized abuses under Section 77B was the organization of such committees at the instigation of insiders, management, or bankers. Investors were usually solicited for acceptances at the outset of the case, often before a plan had even been prepared, and almost always without information upon which to make an intelligent judgment.[50] "Protective" committees frequently solicited proxies from individual security holders under agreements which did not contain even an outline of the plan or reorganization, but which contemplated the formulation of one at some future date.[51] Under the typical agreement, the security holder irrevocably surrendered dominion over his securities and could compel their return only in a few instances and under oppressive conditions.[52] In essence, the committee asked security holders for blanket authority over their securities, to be used in favor of such plan of reorganization as the committee may later propose or approve; individual security holders were given no information upon which to judge the reliability or the qualifications of the committee to discharge this broad trust.[53] Due to the monopolistic control of such committees, their high-pressure solicitation methods, and their failure to make full disclosures, they exercised enormous control over the reorganization process under Section 77B with little accountability.[54]

.Section 77B failed, as the equity receivership before it also failed, to achieve thoroughness and efficiency in the administration of reorganization cases.[55] The drafters of Section 77B did not recognize the fact that a corporate reorganization is essentially a highly technical business problem, and not merely a legal problem, and that, therefore, provision should be made to give to the court and to small creditors and shareholders adequate information, unbiased information, technical and expert information, as to the merits of the plan which they were called upon to approve or disapprove.[56] Section 77B was superseded in 1938 by Chapter X of the Bankruptcy Act.[57]

Chapter X was largely the work of Justice Douglas, then Chairman of the Securities and Exchange Commission, and was based on the Commission's REPORT ON THE STUDY AND INVESTIGATION OF THE WORK, ACTIVITIES, PERSONNEL AND FUNCTIONS OF PROTECTIVE AND REORGANIZATION COMMITTEES.[58] The SEC's investigation and those of Congressional committees and other agencies disclosed numerous problems with the machinery for reorganization under Section 77B:

(1) Virtual control of reorganization proceedings by inside groups, resulting in the perpetuation of such control in the working out of reorganization plans and also in the corporation after reorganization;

(2) The failure of those in control to reveal and punish acts of corporate mis-

50. 6 Pt. 2 COLLIER ON BANKRUPTCY ¶ 7.38, at 1320 (14th ed. 1978).

51. *Id.* at 1322.

52. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 288–89.

53. *Id.* at 286. *See also* 2 A. Dewing, *supra* note 4, at 1273.

54. PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 289.

55. Douglas, *Improvement in Federal Procedure for Corporate Reorganizations,* 24 A.B.A.J. 875, 877 (1938).

56. *Corporate Reorganizations, supra* note 46, at 69. *See generally* 6 COLLIER ON BANKRUPTCY ¶ 0.05, at 61–71 (14th ed. 1978).

57. Act of June 22, 1938, Pub.L. No. 75–696, 52 Stat. 883–905, ch. 575, codified at 11 U.S.C. §§ 501–676 (repealed).

58. Rostow and Cutler, *Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act,* 48 Yale L.J. 1334, 1335–36 (1939). *See* Countryman, *Justice Douglas: Expositor of the Bankruptcy Law,* 16 U.C.L.A.L. Rev. 773 (1969); 2 A. Dewing, *supra* note 4, at 1256 & n. uu (5th ed. 1953). *See also Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 422, 92 S.Ct. 1678, 1682, 32 L.Ed.2d 195 (1972).

management or even more serious offenses;

(3) Inequitable reduction or elimination of minority investment interests; and

(4) The building up of large fees for counsel, trustee, and committees, and the obtaining of other special benefits not justified by any principle of equity.[59]

Chapter X was better drafted than its predecessor, its parts were more logically arranged, and certain ambiguities and contradictions were removed. Generally, however, Chapter X was a restatement and clarification of Section 77B and a codification of much of the case law that developed under that section.[60]

The basic purposes of Chapter X, like Section 77B, were: (1) the avoidance of the evils of equity receiverships; (2) the correction of fee abuses in equity receiverships; (3) to avoid immediate liquidation with a view to rehabilitation; (4) to facilitate recapitalization; (5) to rearrange creditors' rights in the property of the debtor; (6) to administer the case expeditiously and get the debtor out of court, duly reorganized,

in as short a time as possible; (7) to provide relief against a recalcitrant minority group of creditors; (8) to preserve the debtor's going concern value so that it would be available for the payment of creditors' claims; and (9) to effect an equitable distribution of the debtor's assets among its creditors in accordance with their relative priorities.[61] But Chapter X also sought to afford greater protection to creditors and stockholders by providing greater judicial controls over the entire proceeding and impartial and expert assistance in corporate reorganizations through appointment of a disinterested trustee and the active participation of the Securities and Exchange Commission.[62]

Chapters X and XI of the Chandler Act [63] replaced former sections 12, 74 and 77B as the means for corporate reorganization in bankruptcy. Chapter XII, which was largely a composite of provisions from Chapters X and XI, provided for real property arrangements by others than corporations.[64] Chapter XII was designed to deal with secured debt.[65] Chapter XI could deal only with unsecured debt.[66] Although Chapter X could affect secured debt, that

59. Chandler, *The Revised Bankruptcy Act of 1938*, 24 A.B.A.J. 880, 883 (1938). *See generally* PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 308–43.

60. Swanstrom, *Reorganization Under the Federal Statutes*, 17 Chi.-Kent L.Rev. 1, 3 (1938); *Improvement in Federal Procedure for Corporate Reorganizations, supra* note 55, at 875. *See also* Gerdes, *Corporate Reorganizations*, 13 J.Nat. Ass'n.Ref.Bankr. 67, 68 (1939). *See generally* 6 COLLIER ON BANKRUPTCY, *supra* note 56, at ¶¶ 0.08–0.09.

61. *See* 11 REMINGTON ON BANKRUPTCY § 4345, at 14–15 (K. Hayes 1961 rev. ed.).

62. *SEC v. American Trailer Rentals*, 379 U.S. 594, 604, 85 S.Ct. 513, 519, 13 L.Ed.2d 510 (1965).

63. Sections of Chapter X were numbered from 101 to 276 and codified at 11 U.S.C. §§ 501–676. Sections of Chapter XI were numbered from 301 to 399 and codified at 11 U.S.C. §§ 701–799.

64. *See The Revised Bankruptcy Act of 1938, supra* note 59, at 884. Sections of Chapter XII

were numbered from 401 to 526 and codified at 11 U.S.C. §§ 801–926.

65. Chapter XII was intended primarily to afford relief against the threat of mortgage foreclosure. The persons entitled to relief under Chapter XII are indicated by the definition of "debtor" in § 406(6) of the Act:

(6) "debtor" shall mean a person, other than a corporation as defined in this Act, who could become a bankrupt under Section 4 of this Act, who files a petition under this chapter and who is the legal or equitable owner of real property or a chattel real which is security for any debt, but shall not include a person whose only interest in property proposed to be dealt with by the arrangement is a right to redeem such property from a sale had before the filing of such petition.

*See generally* 9 REMINGTON ON BANKRUPTCY §§ 3697–3701, at 374–380 (6th ed. J. Henderson 1955).

66. The major differences between Chapter X, XI, and XII are illustrated by the following table:

chapter was available only to corporate debtors.[67]

Generally, Congress intended Chapter X for the reorganization of big corporations and Chapter XI for small businesses. But "the forty-odd experts who worked eight years revising the Act omitted from it any formula for determining which corporate debtors should be rehabilitated under Chapter X and which under Chapter XI."[68] Neither Chapter X nor Chapter XI provided that proceedings thereunder where restricted to large corporations, or to small corporations, or to particular types of corporations. However, Section 130 of Chapter X required that a petition for relief state "the specific facts showing the need for relief under this chapter and why adequate relief cannot be obtained under Chapter XI."[69]

In the *United States Realty*[70] case the Supreme Court partially resolved the question of whether the two chapters provided debtors with alternative means of proceeding. In that case a corporate debtor filed a petition under Chapter XI. The debtor owned and managed substantial real estate investments and its stock was listed on the New York Stock Exchange. It had 900,000 shares of issued and outstanding stock held by approximately 7,000 shareholders, and had issued two series of publicly held debentures aggregating $2,339,000.00. The Supreme Court held that the case should not have been filed under Chapter XI, and that Chapter X was the suitable chapter for a case of its complexity involving various interests of numerous public investors. But *United States Realty* did not put an end to litigation regarding the proper chapter under which a business reorganization case should proceed. The Supreme Court itself reviewed the interrelationship of Chapters X and XI in two further cases, *SEC v. American Trailer Rentals*, 379 U.S. at 594, 85 S.Ct. at 513, and *General Stores Corp. v. Shlensky*, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956). Large

|  | Chapter X | Chapter XI | Chapter XII |
|---|---|---|---|
| Petition and debtor: | Voluntary or involuntary. | Voluntary petition only. | Voluntary petition only. |
|  | Approval of petition by court required. | Approval not required. | Approval not required. |
|  | Relief available only to corporate debtors. | Any person who could file as bankrupt. | Any person other than corporation who could file under sec. 4 and who owns real property subject to security interest. |
| Chapter officer: | Disinterested trustee and attorney required if debt is more than $250,000. | Receiver or debtor retained in possession. | Trustee or debtor retained in possession. |
| Plans: | Plans may affect unsecured debt, secured debt, and stock interests. | May affect only unsecured debt | May affect secured debt on real property and unsecured debt. |
|  | Plan may be proposed by trustee, debtor, creditors, and stockholders. | Plan may only be proposed by debtor. | Plan may only be proposed by debtor. |
|  | Court approval of plan required before submission for acceptance. | Court approval not required. | Court approval not required. |
|  | Solicitation of acceptances prior to approval of plan not permitted. | Solicitation permitted at any time. | Solicitation permitted at any time. |
|  | Plan must be fair and equitable and feasible. | Plan must be in best interests of creditors and feasible unless accepted by all affected creditors. | Plan must be in best interests of creditors and feasible unless accepted by all affected creditors. |
|  | Participation by SEC. | No SEC participation. | No SEC participation. |

*Hearings Before the House Subcomm. on Civil and Const. Rights on H.R. 31 and H.R. 32*, Ser. No. 27, Pt. 3, 94th Cong., 2d Sess. 1897 (1976).

67. King, *The Business Reorganization Chapter of the Bankruptcy Code—or, Whatever Happened to Chapters X, XI and XII*, 78 Com.L.J. 429 (1973).

68. *Competing Systems of Reorganization: Chapters X and XI of the Bankruptcy Act, supra* note 58, at 1334.

69. 11 U.S.C. § 530 (repealed).

70. *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

public companies often filed a petition under Chapter XI because of its informality and to avoid the mandatory appointment of a Chapter X trustee who would operate the business and investigate management.[71]

Chapter X and Chapter XI embodied different schemes of reorganization and were highly inconsistent with one another. The purposes, philosophies and mechanics of Chapters X and XI differed substantially as to procedure, rationale, complexity, expense, and time requirements.[72] "They were drafted by different groups, with different objects, and according to different models."[73] The drafters of Chapter X were the Securities and Exchange Commission and other "reformers," who sought to eliminate the abuses and correct the defects in Section 77B in order to protect uninformed public investors from exploitation by inside management interests which often controlled reorganization proceedings.[74] Chapter XI, on the other hand, resulted from the lobbying efforts of the National Association of Credit Men and other creditors' groups. Their interest was in preserving the informal and inexpensive methods of dealing with the insolvency of smaller businesses, and Chapter XI was intended to afford practical, swift and economical relief for small debtors through a simplified procedure adapted from Sections 12, 74, and 77B.[75] Chapter X contained detailed safeguards aimed at protecting the interests of public investors, while Chapter XI provided "merely a rudimentary system of creditor control designed for the corpo-

ration which has only trade and commercial creditors." *SEC v. United States Realty & Improvement Co.*, 310 U.S. at 437, 60 S.Ct. at 1044.

Chapter XI was designed to deal with trade debt, not secured or public debt or equity interests.[76] Like its predecessors, Section 12 and Section 74, it was a statutory variation of the common law composition of creditors. *See id.* 379 U.S. at 605, 85 S.Ct. at 519–20. It provided a summary procedure by which a noncorporate debtor could obtain judicial confirmation of an "arrangement" of his unsecured debts.[77] An "arrangement" under Chapter XI was defined as "any plan of a debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, upon any terms."[78] Disclosure to creditors was minimal at best. The premise underlying the absence of significant disclosure requirements in Chapter XI was that trade creditors are most often closely involved with the debtor's business operations and are, therefore, familiar with them and do not require elaborate disclosure in order to make an informed decision about a plan.[79]

In a majority of cases under Section 77B, the debtor remained in possession and management of the corporation during the pendency of the reorganization. This often left the court without sufficient information to exercise a fully informed judgment in the day-to-day administration of the case, and creditors without adequate information of the essential facts upon which to

71. *Hearings on S. 2266 and H.R. 8200 Before the Senate Subcomm. on Improvements in Judicial Machinery,* 95th Cong., 1st Sess. 621 (1927) (statement of Phillip A. Loomis, Jr., Commissioner, Securities and Exchange Commission); *id.* at 996 (statement of Martin I. Klein).

72. *Hearings on S. 235 and S. 236 Before the Senate Subcomm. on Improvements in Judicial Machinery,* 94th Cong., 1st Sess., Pt. II at 556 (1975) (Report of the Bankruptcy Committee of the Commercial Law League of America).

73. Rostow & Cutler, *supra* note 58, at 1335.

74. Comment, *Drawing a Line Between Chapters X and XI of the Bankruptcy Act—Standard of*

*Reason vs. Strict "Public Securities" Test,* 50 N.W.U.L.Rev. 761, 763 (1956).

75. Rostow & Cutler, *supra* note 58, at 1335.

76. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 225 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, pp. 5787, 6185.

77. *SEC v. United States Realty & Improvement Company,* 310 U.S. at 446, 60 S.Ct. at 1048–49.

78. 11 U.S.C. § 706(1) (repealed).

79. H.R.Rep. No. 95–595, *supra* note 76, at 225, U.S.Code Cong. & Admin.News, 1978, p. 5787.

act on a proposed plan.[80] Chapter X strengthened the powers of judicial superintendance over corporate reorganizations and sought to broaden the participation of interested groups.[81]

Chapter X of the Chandler Act required the appointment of a disinterested trustee—and disinterested counsel to such trustees—in the administration of any estate involving fixed and non-contingent indebtedness of $250,000.00 or more.[82] The appointment of an independent trustee was designed both to take the estate out of the hands of those whose mismanagement may have necessitated the reorganization, and to provide the machinery whereby the reorganization would be effectuated under the court's scrutiny and supervision.[83] The trustee was required to make an investigation into the facts pertinent to a determination of how reorganization could best be accomplished upon a sound economic basis. Section 167(5) [84] required the trustee to submit a brief statement of his investigation of the property, liabilities and financial condition of the debtor, and recommendation concerning the desirability of continuing the operations of the corporation. The trustee's report was available to interested parties and their counsel prior to considera-

tion of the plan of reorganization. The trustee was also required to send a notice to all creditors and stockholders that they may submit to him, within the time stated in the notice, suggestions for the formulation of a plan, or proposals in the form of plans.[85] Section 190 [86] of Chapter X required the trustee to file annual reports, copies of which would be mailed to creditors and stockholders. Under Section 189,[87] the bankruptcy court could require the trustee to file interim reports of the debtor's operation and direct distribution thereof to parties in interest.

The second major change of Chapter X was to make available to the bankruptcy court and to creditors and stockholders the expertise of the Securities and Exchange Commission. The Commission's role was purely advisory and its function limited to furnishing administrative assistance and advice to the court.[88] One court described the Commission's role in Chapter X as being "charged with the responsibility to protect the public interest, the general interest of investors, and to serve in an advisory capacity to the bankruptcy court." [89] Another characterized the Commission's role as designed "to safeguard the rights of the

**80.** *Improvement in Federal Procedure for Reorganizations, supra* note 55, at 877.

**81.** *Wolf v. Weinstein,* 372 U.S. 633, 640, 83 S.Ct. 969, 974–75, 10 L.Ed.2d 33 (1963). One writer characterized the reforms embodied in Chapter X as being of two types: "supervisory" reforms and "socializing" reforms. *See* Teton, *Reorganization Revised, supra* note 49. The "supervisory" reforms consisted of those innovations intended to protect uninformed investors from the abuses of debtors in possession, such as mandatory appointment of a disinterested trustee in all cases involving liabilities of $250,000.00 or more, and giving the Securities and Exchange Commission an opportunity to render advisory opinions on whatever plan or plans the court deemed worthy for its consideration in cases involving more than $3,000,000.00. The "socializing" reforms, on the other hand, consisted of provisions intended to increase meaningful participation by creditors and investors, and the "democratization" of the reorganization process. *See generally* 6 COLLIER ON BANKRUPTCY, *supra* note 50, ¶ 8.08, at 96–97. *See also* Swaine, *"Democratization" of Corporate Reorganizations,* 38 Col.L.Rev. 256–79 (1938).

**82.** 11 U.S.C. §§ 556, 557 (repealed).

**83.** PROTECTIVE COMMITTEE REPORT, *supra* note 7, at 337.

**84.** 11 U.S.C. § 567(5) (repealed).

**85.** 11 U.S.C. § 567(6) (repealed).

**86.** 11 U.S.C. § 590 (repealed).

**87.** 11 U.S.C. § 589 (repealed).

**88.** *Improvement in Federal Procedure for Corporate Reorganizations, supra* note 55, at 878. *Cf. In re Penn Timber Co.,* Bankr.L.Rep. (CCH) ¶ 51,710 (D.Ore.1939) (SEC Advisory Report disapproving plan); *In re National Radiator Corp.,* Bankr.L.Rep. (CCH) ¶ 51,960 (W.D.Pa.1939) (SEC Advisory Report approving plan); *In re LaFrance Industries,* Bankr.L.Rep. (CCH) ¶ 52,-051 (E.D.Pa.1939) (SEC Advisory Report disapproving plan).

**89.** *SEC v. Krentzman,* 397 F.2d 55, 57 (5th Cir. 1968).

investing public" and "to present to the court an over-all view of the case which embraces the interests of ... absent parties."[90] Under Section 172[91] of the Chandler Act, if a corporation's indebtedness exceeded $3,000,000.00, the bankruptcy court would automatically submit plans of reorganization it deemed worthy of consideration to the SEC for examination and issuance of an advisory report. The SEC would collect and analyze relevant information about the company and its affairs, including its past and present financial condition, the competence and fidelity of its management, the causes of its financial collapse, and its past operating record and policies, adjusted for unusual and nonrecurring conditions or items. To this analysis was added a broad study of the industry and competitive conditions within it and a consideration of general economic factors likely to affect the industry and the debtor.[92]

There were no hearings before the Commission. Its report on the plan or plans submitted was drafted by the Regional Office staff, subject to review by the Reorganization Division and by the Commission itself.[93] After the Commission's report was filed and copies made available to the parties, there would be a further hearing before the bankruptcy judge. If the judge found the plan to be "fair, equitable, and feasible" and entered an order approving it, the trustee would send to all creditors and shareholders affected by the plan (1) the plan and a summary thereof approved by the court, (2) the opinion of the judge approving the plan, (3) the report of the SEC, if any, or a summary thereof prepared by the SEC, and (4) such other material as the court might deem desirable.[94]

Under Chapter X, the bankruptcy court would consider a plan of reorganization at least twice. Under Section 169,[95] and after notice and hearing, the court would give preliminary approval to the plan. Parties in interest were entitled to object to the plan at that time.[96] At the conclusion of the hearing, the judge was required to enter an order approving the plan or plans which in his opinion contained the essential provisions prescribed by Chapter X and were fair, equitable, and feasible.[97]

With entry of a preliminary order approving a plan of reorganization, the court also fixed a time within which creditors and stockholders affected by the plan could accept it.[98] Without consent of the court no acceptance could be solicited until after a copy and a summary of the approved plan, a copy of the judge's opinion approving the plan, and a copy of the advisory report of the SEC have been sent to creditors and stockholders.[99] Any prior unauthorized ac-

90. *In re St. Charles Hotel Co.*, 60 F.Supp. 322 (D.N.J.), *aff'd* 149 F.2d 645 (3d Cir.), *cert. denied, sub. nom. Ladin v. Hurwith*, 326 U.S. 738, 66 S.Ct. 48, 90 L.Ed. 440 (1945).

91. 11 U.S.C. § 572 (repealed).

92. *See* Gardner, *The SEC and Valuation Under Chapter X*, 91 U.Pa.L.Rev. 440, 444–45 (1943).

93. *Id.* at 446.

94. 11 U.S.C. § 575 (repealed); former Bankruptcy Rule 10–303(e).

95. 11 U.S.C. § 569 (repealed).

96. *Citibank v. Baer*, 651 F.2d 1341, 1345 (10th Cir.1980). *See Hearings on H.R. 31 and H.R. 32 Before the House Subcomm. on Civil and Const. Rights*, Ser. No. 27, Pt. 3, 94th Cong., 2d Sess. 1894–95 (1976).

97. 11 U.S.C. § 574 (repealed). *See* Gerdes, *Corporate Reorganizations: Changes Effected by Chapter X of the Bankruptcy Act*, 52 Harv.L.Rev. 1, 32 (1938). Unlike Chapter X, Section 77B did not expressly authorize the entry of an order of approval. Some courts assumed that since a judicial hearing was prescribed, the entry of an order was contemplated, but one appellate court condemned the practice of entering preliminary orders of approval because of the aid such orders would give to plan proponents in their solicitation of acceptances. *Id. Compare In re Pressed Steel Car Co. of New Jersey*, 16 F.Supp. 325 (W.D.Pa.1936), *In re Prudence Bonds Corp.*, 16 F.Supp. 324 (E.D.N.Y.1935), *and In re Long-Bell Lumber Co.*, Bankr.L.Rep. (CCH) ¶ 3607 (1936) (U.S.D.C., W.D.Mo., 1935), *with Downtown Inv. Ass'n v. Boston Met. Bldgs.*, 81 F.2d 314 (1st Cir.1936).

98. 11 U.S.C. § 574 (repealed).

99. 11 U.S.C. §§ 575, 576 (repealed).

ceptance, or any authority to accept, no matter what the form of that authority, was absolutely null and void and deemed invalid at a confirmation hearing.[100]

After a plan was approved and information required to be sent to affected creditors and shareholders was transmitted, the plan proponent was permitted to solicit acceptances.[101] Section 179 [102] of the Act required the plan to be accepted in writing, filed with the court, by or on behalf of creditors holding two-thirds in amount of the claims filed and allowed in each class, and, if the debtor was solvent, by the stockholders.[103] The Act specifically provided that the order of the judge initially approving the plan prior to its being transmitted to interested parties did not impair the parties' right to object to confirmation.[104] In this manner Chapter X sought to "vitalize" the consent of creditors and stockholders and the approval of the bankruptcy court.[105] Individual creditors and stockholders were given information which was deemed adequate to enable them to pass judgment on the merits of the plan.[106] Their approval of a plan of reorganization became a meaningful act, "the expression of informed judgment freely exercised," in the words of the sponsor of the legislation.[107] And the court, for its part, was not asked to put its imprimatur on a plan that came to it at a late stage in the proceedings without full information about its viability.[108]

Before turning from the historical context of reorganization proceedings to the role of disclosure in modern Chapter 11 cases, it is necessary to make a brief excursion into the sometimes confusing realm of the absolute priority rule.

## II.

### The Relationship Between Disclosure Requirements and the Absolute Priority Rule

The absolute priority rule was first enunciated in equity receivership cases and later made a part of the judicial gloss which case law placed upon the phrase "fair and equitable" as a prerequisite to the approval of plans of reorganization under Section 77B and Chapter X of the former Bankruptcy Act.[109] "The rule, briefly put, is that no class may participate under a plan unless classes having priority are compensated in full." [110]

The *Los Angeles Lumber* [111] case and the *Consolidated Rock* [112] case are basic to an understanding of the absolute priority rule. The former involved the reorganization of the Los Angeles Lumber Products Company under Section 77B of the Bankruptcy Act. The debtor was a holding company whose principal asset consisted of stock of the Los Angeles Shipbuilding and Drydock Corporation. The aggregate value of the debtor's assets was approximately $840,000.00, while its total liabilities, consisting chiefly of claims of first lien mortgage bondholders, totaled more than $3,800,000.00. The debtor's plan of reorganiza-

---

**100.** 11 U.S.C. § 576 (repealed).

**101.** *See* H.R.Rep. No. 1409, *supra* note 44, at 45. *See also* former Bankruptcy Rule 10–304.

**102.** 11 U.S.C. § 579 (repealed).

**103.** *See generally* 6 Pt. 2 COLLIER ON BANKRUPTCY, *supra* note 50, ¶ 7.01[4], at 1183.

**104.** 11 U.S.C. § 580 (repealed); H.R.Rep. No. 1409, *supra* note 44, at 45.

**105.** H.R.Rep. No. 1409, *supra* note 44, at 47.

**106.** *Corporate Reorganization, supra* note 46, at 68.

**107.** H.R.Rep. No. 1409, *supra*, note 44, at 47.

**108.** *Id.*

**109.** *In re Todd,* unpublished memorandum opinion, no. 83C–02153, at 4 (Bkrtcy.D.Utah Jan. 16, 1985). *See Case v. Los Angeles Lumber Co.,* 308 U.S. 106, 118–19, 60 S.Ct. 1, 8–9, 84 L.Ed. 110 (1939).

**110.** *In re Barrington Oaks General Partnership,* 15 B.R. 952, 956, 8 B.C.D. 569, 5 C.B.C.2d 969 (Bkrtcy.D.Utah 1981).

**111.** 308 U.S. at 106, 60 S.Ct. at 1.

**112.** *Consolidated Rock Products v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941).

tion provided for the formation of a new corporation whose capital structure consisted of 641,375 shares of new preferred stock, to be issued to the bondholders, and 188,625 shares of common stock, to be issued to the former common stockholders without payment of any subscription or assessment. The plan was assented to by bondholders holding approximately 92.81% of the face amount of the bonds, and by the holders of 99.75% of the former class A common stock and 90% of the class B common stock. The sole objector to the plan owned about 0.7% of the bonds. The Supreme Court, in a unanimous decision written by Justice Douglas, held that the district court erred in confirming the plan under Section 77B because the plan was not "fair and equitable." Specifically, the Court held that where the debtor is insolvent, the stockholders' participation under the plan of reorganization "must be based on a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder."[113] The Court stated at the outset that where a plan is not "fair and equitable" as a matter of law it could not be confirmed, even though approved by the required majorities of the classes. "The court is not merely a ministerial register of the vote of the several classes of security holders," Justice Douglas wrote, "[a]ll those interested in the estate are entitled to the court's protection."[114]

In 1941, Justice Douglas again addressed the absolute priority rule when he wrote the opinion of the Court in *Consolidated Rock Products v. DuBois.* That case involved the reorganization under Section 77B of a holding company and its two wholly-owned subsidiaries. The district court confirmed a plan of reorganization which provided for the formation of a new corporation to which would be transferred all of the assets of the three entities free of all claims, with the issuance of income bonds and preferred stock to the former bondholders, and new common stock to the former preferred stockholders of Consolidated Rock Products Company. The Supreme Court held that the plan violated the absolute priority rule, which precluded participation by stockholders of the parent company until the bondholders of the subsidiaries had been made whole, unless they contributed property to the new company or unless the value of the assets of the three companies exceeded the bondholders' claims.

The function of the absolute priority rule was, in essence, a way of structuring negotiations among the various parties in interest, "largely by validating or invalidating certain lines of argument and by fixing boundary marks upon the areas within which negotiation [was] allowable."[115] Like the mandatory appointment of a disinterested trustee in Chapter X, the absolute priority rule was thought to be necessary to insure that a few insiders would not use the reorganization process to gain an unfair advantage over other creditors.[116] In operation, the rule required first that the

---

**113.** 308 U.S. at 122, 60 S.Ct. at 10.

**114.** 308 U.S. at 114, 60 S.Ct. at 6–7. To summarize, the *Los Angeles Lumber* case laid down four principles which had to be followed in reorganization cases: (1) the fundamental principle was the unequivocal adoption of the absolute priority theory of creditors' rights; (2) the second was that the words "fair and equitable" as used in § 77B and later in Chapter X of the Bankruptcy Act required full compensation to bondholders and creditors before the participation of stockholders; (3) the third was that the shareholders of an insolvent corporation must contribute property in order to participate under a plan of reorganization; and (4) the fourth principle was that the bankruptcy court is not bound by the consent of the creditors and

stockholders when deciding on whether or not a plan is fair and equitable. *See* 2 A. Dewing, *supra* note 4, at 1306–07. The *Los Angeles Lumber* opinion also marked the first time the Supreme Court used the term "absolute priority." *See generally* Billyou, *Priority Rights of Secured Holders in Bankruptcy Reorganization: New Direction,* 67 Harv.L.Rev. 553, 564 (1954).

**115.** Blum and Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations,* 41 U.Chi. L.Rev. 651, 653 (1974).

**116.** REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. I at 255 (1973).

value of the debtor's property and business be ascertained. "Reorganization value" was a substitute for "market value" in corporate reorganizations.[117] One court described "reorganization value" as follows:

[R]eorganization value is a forecast of future earnings, converted to present value by a capitalization or discount rate. This capitalization or discount rate reflects the expected annual rate of return on an investment and the choice of this rate is a question of judgment which must reasonably relate to the rates of return generally expected by investors from comparable investment opportunities.[118]

In order to distribute the value of the business among the various claimants, it was necessary to make a precise valuation. "The usual valuation process involve[d] making a projection of earnings (based upon past performance, foreseeable capital needs, and estimated revenues and costs) and then capitalizing earnings at an appropriate rate. Capitalization establishes the relationship between projected earnings and total present value." [119]

The rule was the subject of much criticism. Opponents pointed out that (1) the valuation process was so difficult and unreliable as to be arbitrary; [120] (2) the rule often operated to eliminate common stockholders, including top management, from participation in the reorganized debtor, which resulted in existing management being unwilling to remain with the company; (3) strict adherence to the rule obstructed and interfered with the plan negotiation process; (4) the rule caused unreasonable delay in the reorganization process by necessitating protracted and costly valuation litigation; (5) because a corporate debtor's management would try to file under Chapter XI, in which the rule did not apply, rather than Chapter X, the issue of which chapter applied to a particular corporation resulted in extended litigation; and (6) as a matter of fairness, a reorganization should impose proportional sacrifices upon investors by making priorities relative rather than absolute.[121]

The Commission on the Bankruptcy Laws of the United States recommended radical changes in the absolute priority rule.[122] Among other things, the Commis-

117. Blum, *The Law and Language of Corporate Reorganization,* 17 U.Chi.L.Rev. 565, 571 (1950).

118. *In re Equity Funding,* 391 F.Supp. 768, 772 (C.D.Cal.1975).

119. *The Absolute Priority Doctrine in Corporate Reorganizations, supra* note 115, at 656. *See also* 6A COLLIER ON BANKRUPTCY, *supra* note 50, ¶ 11.05, at 184–203; H.R.Rep. No. 95–595, *supra* note 76, at 225.

120. Professor Coogan once characterized the valuation process as "an estimate compounded by a guess." H.R.Rep. No. 95–595, *supra* note 76, at 225, U.S.Code Cong. & Admin.News 1978, p. 6185.

121. *The Absolute Priority Doctrine in Corporate Reorganizations, supra* note 115, at 657–59. *See In re Barrington Oaks General Partnership,* 15 B.R. at 957; REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, *supra* note 116, Pt. I at 256–58 (1973).

122. *See* Brudney, *The Bankruptcy Commission's Proposed "Modifications" in the Absolute Priority Rule,* 48 Am.Bankr.L.J. 305, 307 (1974). Those changes included the following:

Section 7–310(d)(2)(B) of the bankruptcy reform statute proposed by the Commission would have modified the valuation required under the "fair and equitable" standard for confirmation. COMMISSION REPORT, *supra* note 116, Pt. II, at 252. Under that provision, it was only necessary that the court find that there was "a reasonable basis for the valuation on which the plan is based." By permitting a looser evidentiary standard the Commission would have made it easier for junior interests to participate. *See* COMMISSION REPORT, Pt. I, at 258. Under § 7–310(d)(2)(B), the Commission would have permitted a senior class of creditors or shareholders, by majority vote, to accept less than full satisfaction of their claims and to allow the common stockholders to participate to the extent of the value given up by the senior class. The absolute priority rule prohibited such waiver if not made unanimously by members of the senior class. *See The Bankruptcy Commission's Proposed "Modifications" in the Absolute Priority Rule,* at 309 n. 10. Under § 7–303(3), the Commission would have allowed plans to provide for delayed participation by holders of valueless securities, who would otherwise have been completely excluded from participating. Finally, § 7–303(4) of the Commission's bill would have permitted participation by equity

sion recommended that if no publicly held securities would be affected by the plan of reorganization, and if the court found that the plan was "knowingly and voluntarily accepted by the creditors and security holders affected after full disclosure," no finding of valuation as a basis for applying the rule should be required.[123] The Commission agreed with opponents of the rule that in practice it often served "only to prevent reasonable compromises and to wipe out the interest of shareholders. The rule leads to a large amount of useless litigation and should be replaced by a flexible standard."[124] The National Bankruptcy Conference also agreed that the rule should be relaxed:

> [The National Bankruptcy Conference] suggests that enforced paternalism may not be the best of all possible worlds under all possible circumstances and that well informed and represented creditors should be permitted to determine for themselves that which is in their best economic interests.[125]

In their joint explanatory statement, the floor managers of the 1978 Bankruptcy Code further pointed out how the rule tended to harm the interests of those it was intended to protect:

> It is also important to note that in 1938 when the Chandler Act was enacted, public investors commonly held senior, not subordinated, debentures and corpora-

tions were very often privately owned. In this environment, the absolute priority rule protected debenture holders from an erosion of their position in favor of equity holders. Today, however, if there are public security holders in a case, they are likely to be holders of subordinated debentures and equity and thus the application of the absolute priority rule under chapter X leads to the exclusion, rather than the protection, of the public.[126]

The Bankruptcy Code as enacted contains significant changes in the absolute priority rule, though not as sweeping as those recommended by the Commission.[127] The modified rule is found in Section 1129(b), the so-called "cramdown" provision. The term "cramdown" simply refers to the bankruptcy court's power to force any dissenting class to accept the terms of a Chapter 11 plan which it refuses to accept voluntarily. "The general principal of the subsection permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan. If it is paid in full, then junior classes may share."[128] Under the Code, then, the absolute priority rule is used only for dissenting classes.[129] In the absence of a dissenting class, confirmation

---

security holders if they were found to make a "contribution which is important to the operation of the reorganized debtor." *See id.* at 335–339.

**123.** COMMISSION REPORT, *supra* note 116, Pt. I, at 258. The Commission favored negotiation, reasonable compromises, flexibility, and majority rule in the plan confirmation process:

> At stake is who gets the difference between the liquidation value and the going concern value of a corporation. Should the statute permit the creditors themselves to decide by a majority vote? There is merit to the proposition that the creditors, if they are small in number and sophisticated, should be permitted to bargain out this issue of allocation of the going concern bonus with the debtor. This once was the law in equity receivership reorganizations, but it was subject to abuse, and judicial control was imposed by the Supreme Court in *Boyd*. Such judicial control is

still needed, but the need for flexibility should also be recognized.
> *Id.,* Pt. I, at 259.

**124.** *Id.* at 256.

**125.** *Hearings on H.R. 31 and H.R. 32, supra* note 66, at 1896–97.

**126.** 124 Cong.Rec.S. 17,418 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini); 124 Cong. Rec.H. 11,101 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).

**127.** *See* 11 U.S.C. § 1129(b).

**128.** H.R.Rep. No. 95–595, *supra* note 76, at 413, U.S.Code Cong. & Admin.News 1978, p. 6369.

**129.** 3 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 63.22, at pt. 63—p. 31 (1981).

will not entail an expensive and time-consuming valuation of the debtor's business.[130] "The main protection theme in reorganizations under the Bankruptcy Code is that adequately informed classes of creditors and shareholders can look after their own interests in the processes of negotiating plans. The 'fair and equitable' standard is a protective backstop only if an impaired class rejects a plan. The role of that standard is thus greatly curtailed under the new Code."[131]

## III.

### The Role of Disclosure in Chapter 11

Although Chapter X provided numerous investor protection features designed to promote informed participation in the reorganization process, nothing directly comparable to a disclosure statement existed under the former Bankruptcy Act.[132] The Commission on the Bankruptcy Laws of the United States recommended the elimination of many of the investor protection features; it opposed the mandatory appointment of a trustee, favored a greatly reduced role for the SEC and restoration of the debtor's management responsibilities, as well as consolidation of Chapters X, XI, and XII into a single reorganization chapter.[133] Creditor control over the reorganization process, rather than judicial involvement in estate administration, was a dominant theme in the legislative history of Chapter 11.[134]

In consolidating the reorganization chapters, it was necessary for Congress to determine the extent of the disclosure to creditors and equity security holders required, and the extent of the court's determination of the propriety of the plan prior to voting. The Bankruptcy Commission proposed that an approval hearing be required for plans "materially and adversely affecting publicly held securities."[135] The Administrator of the proposed new administrative agency, the United States Bankruptcy Administration,[136] would take the place of the SEC and file an advisory report concerning the plan.[137] The Bankruptcy Commission's bill proposed to limit the SEC's participation in reorganization to its regulatory role under federal securities laws. Finally, the Commission's bill did not provide for an approval hearing for plans that did not affect publicly held securities.[138]

The rival legislation proposed by the National Conference of Bankruptcy Judges (the "Judges' bill") contained major differences from the Commission's bill. It contemplated the continued active participation of the SEC in reorganization cases and provided that the SEC, rather than the Administrator, would prepare an advisory report, which was optional, not mandatory.[139] The most significant difference between the two bills, however, was the judges' proposal to retain two reorganization chapters.[140] The Judges' Chapter VIII, entitled "Arrangements," was patterned after Chapter XI of the Bankruptcy

130. H.R.Rep. No. 95–595, *supra* note 76, at 414.

131. Blum, *The "Fair and Equitable" Standard for Confirming Reorganizations Under the New Bankruptcy Code,* 54 Am.Bankr.L.J. 165, 172 (1980).

132. *See* Moller & Foltz, *Chapter 11 of the Bankruptcy Code,* 58 N.C.L.Rev. 881, 917 (1980).

133. *See* COMMISSION REPORT, *supra* note 116, Pt. I, at 28, 245–59.

134. *See, e.g.,* COMMISSION REPORT, *id.,* Pt. I, at 92–94; *id.* at 256–59; *Hearings on H.R. 31 and H.R. 32, supra* note 66, at 1547; *id.* at 1691–92; *id.* at 1872–1941.

135. COMMISSION REPORT, *supra* note 116, Pt. II at § 7–306(a).

136. *Id.,* Pt. I at 8, 248–49.

137. *Id.,* Pt. II at § 7–306(b).

138. *See id.* at § 7–307. The distinction between plans that affected publicly-held securities and those that did not led to the characterization of the Commission's bill as a "one chapter, two track" system.

139. *Hearings on H.R. 31 and H.R. 32, supra* note 66, App., Ser. No. 27, § 7–305(b), at 254–55.

140. *See id.* §§ 8–101 to 8–401, at 270–288.

Act, and did not require an initial approval hearing nor any advisory report.[141] But when the judges testified before the House Subcommittee on Civil and Constitutional Rights on March 29, 1976, Judge Moller stated that the National Conference of Bankruptcy Judges did not oppose a consolidated reorganization chapter.[142] He suggested that if Congress were to eliminate the two-chapter approach, the consolidated chapter should be based on Chapter XI "with alterations ... to take care of these unusual cases that require the Chapter X treatment." [143]

The National Bankruptcy Conference also endorsed the consolidation of reorganization into a single chapter,[144] but recommended that the Commission's bill be changed so as to provide for the continued participation of the Securities and Exchange Commission in reorganization cases.[145] The SEC itself strongly opposed the Bankruptcy Commission's proposal that a new Bankruptcy Administrator take over the existing functions of the SEC in Chapter X and urged Congress to retain those provisions.[146]

At the urging of Representative Edwards, the National Bankruptcy Conference and the National Conference of Bankruptcy Judges sought to resolve their differences. In May and June 1976 the two groups met to discuss an alternative reorganization scheme. They reached a compromise agreement and urged Congress to enact a single consolidated business reorganization chapter. Their new proposal was sent to Representative Edwards on June 12, 1976 for inclusion in the legislative record:

> All business entities, individuals, partnerships, and corporations, public or private, are subject to reorganization under a single, consolidated reorganization chapter. (Present Chapters X, XI and XII are abolished.) All debtors are treated substantially alike except for the provisions with respect to solicitation of acceptances to a plan. And distinctions, generally speaking, arise only when principles of the securities laws relating to solicitations of consents should require a different treatment. As a result, the powers of all reorganization entities, standards for displacement of management, and the standards for confirmation are identical.
>
> In essence, a plan may affect any debt, public or private, secured or unsecured, and any equity interest, public or private. The statute should be structured so as to place emphasis upon the agreement by parties to the terms of a plan, court supervision to assure adequate disclosure to those whose consents are necessary, and, to the extent possible, the elimination of unnecessary delay in the progress of the case. The net effect of these principles is to retain the simplicity of an arrangement with unsecured private creditors while, at the same time, to make a more complex reorganization less cumbersome and quicker to process.[147]

The premise underlying their joint proposal for a consolidated chapter was that if adequate disclosure was provided to all creditors and stockholders whose rights were to be affected, then they should be able to make an informed judgment on their own, rather than having the court or the Securities and Exchange Commission inform them in advance of whether the proposed plan is in their best interest:

---

141. *Id.*

142. *Id.* Pt. 3, at 1905.

143. *Id.* at 1906.

144. *Id.* at 1872–78 (statement of Harvey R. Miller, William J. Rochelle, Jr., and J. Ronald Trost on behalf of the National Bankruptcy Conference).

145. *Id.* at 1880–81.

146. *Hearings on S. 235 and S. 236 Before the Senate Subcomm. on Improvements in Judicial Machinery,* 94th Cong., 1st Sess. 708, 731–32 (1975) (testimony of Philip A. Loomis, Jr., Commissioner, Securities and Exchange Commission).

147. *Hearings on H.R. 31 and H.R. 32, supra* note 66, Pt. 3 at 1939.

## VI—Solicitation of Consents

The essential principle governing solicitation of consents is adequate disclosure of the information necessary for parties to make an informed judgment. Such disclosure can be asserted from two sources, depending on the time when the solicitation occurs.

### A. Pre-Petition Solicitation

Consents to any plan that are solicited prior to the filing of the petition shall be effective in the reorganization case provided the solicitation complied with applicable nonbankruptcy law. Thus, when the terms of a plan are such that consents thereto may be solicited only by compliance with securities laws, federal or state, and the rules and regulations of the Securities & Exchange Commission, solicitation must comply with those laws and rules. Assuming, for example, that SEC approval had been obtained when necessary, consents received through such solicitation may, after the filing of the petition, be with the court and counted. If the consent solicitation did *not* comply with non-bankruptcy law, the consent would have to be re-solicited. When there is no non-bankruptcy law regulating the solicitation, as for example when only private unsecured debt is to be affected by the plan, the pre-petition consents would be counted unless, at confirmation, the court found the disclosure was inadequate.

### B. Post-petition Solicitation

All post-petition solicitation of acceptances should be approved by the court in advance of solicitation, regardless of the form of the entity or whether a trustee is appointed. Before consents may be solicited by debtors (whether individuals, partnerships or public or private corporations) or by creditors, the court must hold a hearing to determine the adequacy of the disclosure of the solicitation materials unless the court finds that the expense of the hearing is disproportionate to the protection to be afforded. Whenever there is any public interest in the case, the SEC should be active in the determination of whether the disclosure hearing is necessary and the adequacy of the disclosure to be made.

The disclosure hearing will be one of, if not the major procedural hearing in a reorganization case. Through its general power to regulate solicitation the court may, when necessary to prevent confusion, prevent simultaneous solicitation of competing plans. In very small cases it would be proper to dispense with any hearing at all with the court approving the solicitation material on *ex parte* application. At the hearing in any case involving a public interest, the court will have the advice of the SEC. The court will have the power, if necessary to a determination of the adequacy of the disclosure, to receive valuation evidence, but a going concern valuation would not, as a general rule, be a prerequisite to a finding of adequate disclosure.[148]

Three new bankruptcy reform bills were introduced during the first session of the 95th Congress, the first two in the House, H.R. 6 on January 4, 1977, and H.R. 8200 on July 11, 1977, and the third in the Senate, S. 2266 on October 31, 1977. These bills each provided for a single reorganization chapter, now identified as Chapter 11, and introduced the disclosure statement proposed by the National Bankruptcy Conference and National Conference of Bankruptcy Judges.[149]

The Senate bill, S. 2266, allowed for significant SEC involvement in reorganizations of public companies. A "public company" was defined in Section 1101(3) of the Senate bill as a debtor who, within 12 months prior to the filing of the petition, had outstanding liabilities of $5,000,000.00

---

148. *Id.* at 1940.

149. *See Hearings on S. 2266 and H.R. 8200 Before the Senate Subcomm. on Improvements in*

*Judicial Machinery,* 95th Cong., 1st Sess. 222–25 (1977).

or more and not less than 1,000 security holders.[150] In the case of a public company, appointment of a trustee was mandatory,[151] the SEC would file an advisory report,[152] and plans of reorganization had to adhere to the absolute priority rule.[153] During hearings on November 29, 1977 before the Senate Subcommittee on Improvements in Judicial Machinery, the Securities and Exchange Commission again urged Congress not to return the reorganization process to debtors in possession and abandon the Chapter X protective safeguards for public investors.[154] The Commission characterized H.R. 8200, which did not contain the public investor safeguards of S. 2266, as "a long step backward," adding that its entire scheme for reorganization was modeled after Chapter XI, which was "originally designed for the rehabilitation of small and privately owned businesses."[155]

In adopting the House version over the Senate proposal, Congress rejected the premise of Chapter X that "creditors and stockholders simply are unable to make an intelligent and informed decision [about the plan] without the SEC's report, all of the valuation evidence developed at the disclo-

sure hearing, and an order of the court finding the plan worthy of consideration and approving the plan."[156] Congress believed that it was a "myth" that safeguards such as those contained in Chapter X were necessary for the protection of public investors.[157] Chapter X was regarded as an anachronism and Congress deliberately dismantled its rigid and time-consuming procedures in favor of a more flexible approach to reorganization.[158]

The premise underlying Chapter 11 is disclosure.[159] "[T]he parties should be given adequate disclosure of relevant information, and they should make their own decision on the acceptability of the proposed plan or reorganization."[160] Disclosure under Section 1125, not judicial paternalism which characterized Chapter X, is the central feature of Chapter 11.[161] The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders would make an informed judgment about a plan of reorganization.[162] Solicitation of acceptances or rejections of a proposed plan after the commencement of the case is prohibited unless there has been transmitted to each holder of a claim or interest a

**150.** *Id.* at 204.

**151.** *Id.* § 1104(a), at 207.

**152.** *Id.* § 1128(b) and (c), at 228–29.

**153.** *Id.* §§ 1128(c), 1130(a)(7), at 228, 230–31.

**154.** *Id.* at 620–48 (statement and testimony of Philip A. Loomis, Jr., Commissioner, Securities and Exchange Commission).

**155.** *Id.* at 622.

**156.** H.R.Rep. No. 95–595, *supra* note 76, at 225, U.S.Code Cong. & Admin.News 1978, p. 6185.

**157.** 124 Cong.Rec.H. 11,101 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong. Rec.S. 17,418 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini).

**158.** *Id. See* 5 COLLIER ON BANKRUPTCY ¶ 1125.02, at 1125–12 to –14 (15th ed. 1985).

**159.** H.R.Rep. No. 95–595, *supra* note 76, at 226. *See* Corotto & Picard, *Business Reorganizations Under the Bankruptcy Reform Act of 1978—A New Approach to Investor Protections and the*

*Role of the SEC,* 28 DePaul L.Rev. 961, 987–97 (1979). The House Report indicates that with adequate disclosure creditors could independently evaluate the plan without extensive judicial involvement in the process:

> If adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own, rather than having the court or the Securities and Exchange Commission inform them in advance of whether the proposed plan is a good plan.

H.R.Rep. No. 95–595, at 226, U.S.Code Cong. & Admin.News 1978, p. 6185. *See* Note, *Disclosure in Chapter 11 Reorganizations: The Pursuit of Consistency and Clarity,* 70 Cornell L.Rev. 733, 735 (1985).

**160.** H.R.Rep. No. 95–595, *supra* note 76, at 224, U.S.Code Cong. & Admin.News 1978, p. 6183.

**161.** *Id.* at 226.

**162.** *See In re Egan,* 33 B.R. 672, 675, 11 B.C.D. 476 (Bkrtcy.N.D.Ill.1983); *In re Brandon Mill Farms, Ltd.,* 37 B.R. 190, 192, 10 C.B.C.2d 283 (Bkrtcy.N.D.Ga.1984).

disclosure statement approved by the court, after notice and a hearing, as containing "adequate information."[163] This prohibition is designed to prevent "end-runs" around the disclosure requirements.[164]

The phrase "adequate information," is the standard for disclosure under Chapter 11. It is defined in Section 1125(a) as

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan [.]

The required disclosure is determined by the courts on a case-by-case basis, which "permits a certain amount of flexibility based on the condition of the debtor and of his books and records."[165] Generally, the disclosure statement should set forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan."[166] Information often required to be disclosed includes:

1. The circumstances that gave rise to the filing of the bankruptcy petition.

2. A complete description of the available assets and their value.

3. The anticipated future of the debtor.

4. The source of the information provided in the disclosure statement.

5. A disclaimer.

6. The condition and performance of the debtor while in Chapter 11.

7. Information on claims against the estate.

8. The estimated return that creditors would receive under Chapter 7.

9. The accounting and valuation methods used in the disclosure statement.

10. Information regarding the future management of the debtor.

11. A summary of the plan of reorganization.

12. An estimate of all administrative expenses, including attorneys' fees and accountants' fees.

13. The collectibility of any accounts receivable.

14. Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan.

15. Information relevant to the risks being taken by the creditors and interest holders.

16. The actual or projected value that can be obtained from voidable transfers.

17. The existence, likelihood and possible success of non-bankruptcy litigation.

18. Any tax consequence of the plan.

19. The relationship of the debtor with affiliates.[167]

Once the disclosure statement is approved, all creditors and equity security holders must be mailed (1) the plan, or a court approved summary of the plan; (2) the court approved disclosure statement; (3) notice of the time within which plan acceptances or rejections must be filed; (4) notice of the confirmation hearing; and (5)

**163.** 11 U.S.C. § 1125(b). *Cf. In re Snyder,* 51 B.R. 432, 436–37, 13 B.C.D. 396 (Bkrtcy.D.Utah 1985) (what constitutes an unauthorized solicitation of votes for a plan of reorganization).

**164.** H.R.Rep. No. 95–595, *supra* note 76, at 227, U.S.Code Cong. & Admin.News 1978, p. 6186.

**165.** *Id.* at 225–26, U.S.Code Cong. & Admin. News 1978, pp. 6184, 6185.

**166.** *In re The Stanley Hotel, Inc.,* 13 B.R. 926, 929, 8 B.C.D. 35, 5 C.B.C.2d 64 (Bkrtcy.D.Colo. 1981).

**167.** *See In re Metrocraft Publishing Services, Inc.,* 39 B.R. 567, 568, 10 C.B.C.2d 1182 (Bkrtcy. N.D.Ga.1984). *See also In re The A.C. Williams Co.,* 25 B.R. 173, 176, 9 B.C.D. 1239 (Bkrtcy.N.D. Ohio 1982); *In re William F. Gable Co.,* 10 B.R. 248, 249, 7 B.C.D. 571 (Bkrtcy.N.D.W.Va.1981).

any other information that the court may direct.[168] In addition, a form of ballot must be mailed to creditors and equity security holders entitled to vote on the plan.[169]

Several courts have ruled that § 1125(b) requires a disclosure statement only where votes are solicited.[170] Those decisions may have rested in part on the view that an unimpaired class which is "deemed" to have accepted the plan pursuant to § 1126(f) should be treated as though it had cast an affirmative vote in favor of the plan. With one such class having accepted the plan, the requirement of § 1129(a)(10) would be satisfied and the "cram down" provision of § 1129(b) would enable the plan proponent to confirm a plan without having first obtained approval of a disclosure statement and solicited acceptances from parties in interest. In *Matter of Union County Wholesale Tobacco*, 8 B.R. at 442, the debtor filed a disclosure statement and Chapter 11 liquidating plan which left unimpaired the claim of the debtor's principal secured creditor. The disclosure statement stated that payment to unsecured creditors under the plan appeared unlikely. At the hearing on the adequacy of the disclosure statement, the debtor indicated that because the secured creditor's claim was unimpaired, it was deemed to have accepted the plan under § 1126(f). Furthermore, since the debtor intended to confirm the plan under the "cramdown" provisions of § 1129(b), it did not intend to solicit acceptances or rejections, and thus believed it could dispense with the need for a disclosure statement altogether. The court agreed, stating that in its view the legislative history of § 1125(b) indicated that Congress intended to restrict the purpose of a disclosure statement to situations in which plan acceptances are required and solicited.

In *In re Rail King, Inc.*, 33 B.R. 4 (Bkrtcy.N.D.Ohio 1983), the debtor sought to dispense with a disclosure statement. It argued that because three classes of secured claims were unimpaired, it did not need the affirmative vote of any class of creditors in order to confirm its plan. The court disagreed with *Union County Wholesale Tobacco* and held that § 1126(a) gives impaired classes the opportunity to vote on a plan, and the debtor could not cram down its plan without first transmitting to impaired creditors an approved disclosure statement, together with a copy of the plan and a ballot to accept or reject the plan.

This Court rejected the premise of *Union County Wholesale Tobacco* in *In re Barrington Oaks General Partnership*, 15 B.R. at 952, and held that the *affirmative* vote of an *impaired* class is required to satisfy § 1129(a)(2), (10). The result of *Barrington Oaks* was codified in 1984 when Congress amended § 1129(a)(10).[171]

■ Generally speaking, there are four situations in which acceptances need not be obtained from creditors or shareholders. First, there are situations in which the plan does not purport to deal with a particular class at all. If a class is to receive nothing under the plan, it is deemed to have rejected the plan and its vote need not be solicited.[172] Second, the rights of members of a particular class may not be affected in any way by the plan. If a class is not "impaired" under the plan, that class is deemed to have accepted the plan and votes

---

**168.** Bankruptcy Rule 3017(d).

**169.** *Id.*

**170.** *See, e.g., In re The Stanley Hotel, Inc.*, 13 B.R. at 929, *Matter of Union County Wholesale Tobacco and Candy Co.*, 8 B.R. 442, 443, 3 C.B. C.2d 844 (Bkrtcy.D.N.J.1981); *In re Bel Air Associates*, 4 B.R. 168, 175, 6 B.C.D. 284, 2 C.B.C.2d 103 (Bkrtcy.W.D.Okla.1980). *Contra, In re Transload and Transport, Inc.*, 61 B.R. 379 (Bkrtcy.M.D.La.1986).

**171.** Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 512, 98 Stat. 386–87 (July 10, 1984). Section 1129(a)(10) now provides:
> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

**172.** 11 U.S.C. § 1126(g). *See Business Reorganizations Under Chapter 11 of the Bankruptcy Code, supra* note 18, at 1329.

need not be solicited from members of the class.[173] Third, a creditor whose claim is disallowed in its entirety is not entitled to vote on the plan.[174] Fourth, the court may disregard the vote of an entity "whose acceptance or rejection of the plan was not in good faith." [175]

■ Under Chapters X, XI and XII of the Bankruptcy Act, creditors who were "affected" by a plan were entitled to vote.[176] A creditor was deemed to be affected under those chapters if its interest was "materially and adversely" affected by the plan.[177] The bankruptcy statute proposed by the Commission on the Bankruptcy Laws of the United States retained this standard and would have permitted confirmation only if the plan was accepted by creditors who were "materially and adversely" affected.[178] But the drafters of the Code ultimately replaced the concept of "affected" by the new concept of "impairment." In Section 1124 Congress defined "impairment" in the broadest possible terms, declaring that *any* change in legal, equitable or contractual rights creates impairment.[179]

■ Sections 1124, 1125(b), and 1126(a) and (f), are interrelated provisions of an elaborate statutory scheme. The plain language of Section 1126(a) does not require a holder of a claim or interest to vote. It provides only that a creditor *may* accept or reject a plan. *Heins v. RUTI–Sweetwater (In re Sweetwater)*, 57 B.R. 748, 750 (D.Utah 1985) (per Jenkins, D.J.). Unlike the provisions of Chapters X, XI,

and XII, which made non-votes count as rejections, Section 1126(c) specifies that the required amount and number of acceptances for a class of creditors (*i.e.*, two-thirds in amount and more than one-half in number) are computed based on the number of claims that *actually vote* for or against the plan.[180] When Sections 1124 and 1126(f) are read together and in light of the legislative history of Chapter 11 and 100 years of reorganization practice, the meaning is clear. The expression of acceptance or rejection of a plan is not a meaningless exercise and the right to vote should not be abrogated in the interest of expediency. Congressional intent is given further effect by Bankruptcy Rule 3018(a), which provides in part:

(a) *Persons Entitled To Accept or Reject Plan; Time for Acceptance or Rejection.* A plan may be accepted or rejected by the following entities within the time fixed by the court pursuant to Rule 3017:

(1) any creditor whose claim is deemed allowed pursuant to § 502 of the Code or has been allowed by the court;

(2) subject to subdivision (b) of this rule, any creditor who is a security holder of record at the date the order approving the disclosure statement is entered whose claim has not been disallowed; and

(3) an equity security holder of record at the date the order approving the disclosure statement is entered

---

**173.** 11 U.S.C. § 1126(f). *See* King, *Chapter 11 of the 1978 Bankruptcy Code*, 53 Am.Bankr.L.J. 107, 125–26 (1979). Several courts have held that whereas an impaired class which receives nothing under the plan is conclusively presumed to have rejected it, the presumption of acceptance under Section 1126(f) for an unimpaired class is rebuttable by the *actual* rejection of the plan by the unimpaired class. *See generally In re Jones*, 32 B.R. 951, 954–55 n. 5, 10 B.C.D. 1446, Bankr.L.Rep. (CCH) ¶ 69,374, 9 C.B.C.2d 451 (Bkrtcy.D.Utah 1983) (collecting cases).

**174.** 11 U.S.C. § 1126(a).

**175.** 11 U.S.C. § 1126(e).

**176.** *See* 11 U.S.C. §§ 574, 762, 868 (repealed).

**177.** 11 U.S.C. §§ 507, 708, 807 (repealed). *See In re Barrington Oaks General Partnership*, 15 B.R. at 959–61; *In re Jones*, 32 B.R. at 957.

**178.** COMMISSION REPORT, *supra* note 116, Pt. II, at §§ 7–309(a), 7–310(d)(1).

**179.** Even though a plan specifies that a particular class is not impaired, that class is entitled to be heard and argue the issue of impairment. *In re Jones*, 32 B.R. at 954, n. 5.

**180.** *See Chapter 11 of the 1978 Bankruptcy Code, supra* note 173, at 125.

whose interest has not been disallowed.

■ Congress intended for the hearing on the adequacy of a disclosure statement to "be one of, if not the major procedural hearings in a reorganization case."[181] Section 1125(b) prohibits postpetition solicitation of plan acceptances until after the court has approved the disclosure statement as containing adequate information. The language of Bankruptcy Rule 3016(c) seems to mandate a disclosure statement in all instances.[182] The rule provides:

*Disclosure Statement.* In a chapter 9 or 11 case, a disclosure statement pursuant to § 1125 or evidence showing compliance with § 1126(b) of the Code shall be filed with the plan or within a time fixed by the court.

Likewise, under the Bankruptcy Rules, a hearing on the adequacy of the disclosure statement is mandatory.[183] Congress intended for the Bankruptcy Code to contain very little of a procedural nature, unlike the former Act, preferring that matters of procedure be dealt with by the Bankruptcy Rules or fashioned by the courts on a case-by-case basis.[184] Congress empowered the United States Supreme Court "to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11." 28 U.S.C. § 2075. But it also made clear

that "[s]uch rules shall not abridge, enlarge, or modify any substantive right." *Id.* Referring to the former Bankruptcy Rules, the Court of Appeals for the Ninth Circuit stated:

Following the pattern it had established in the areas of civil procedure, criminal procedure, and admiralty, Congress delegated the authority to draft bankruptcy rules to the Supreme Court, apparently deferring to the Court's competence to formulate rules of practice and procedure. The proposed bankruptcy rules were studied by committees of experts, then adopted by the Supreme Court, and became effective only after submission to Congress for review.[185]

In promulgating Bankruptcy Rules 3016(c), 3017(a), and 3018(a), this Court will not assume that the Supreme Court acted beyond its delegated power or that Congress permitted to become operative rules affecting substantive rights. On the contrary, as the foregoing analysis demonstrates, the rules are consistent with the clear intent of Congress in enacting Sections 1124, 1125, and 1126 of the Code. Therefore, this Court holds that the submission of an approved disclosure statement, together with the plan and ballots, to parties entitled to vote pursuant to Bankruptcy Rule 3018(a), is a prerequisite to the

**181.** H.R.Rep. No. 95–595, *supra* note 76, at 227 & 229, U.S.Code Cong. & Admin.News 1978, pp. 6186, 6188.

**182.** 3 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 62.01 n. 1 (1985 Ann. Cum.Supp.)

**183.** Bankruptcy Rule 3017(a) provides:

(a) *Hearing on Disclosure Statement and Objections Thereto.* Following the filing of a disclosure statement as provided in Rule 3016(c), the court *shall* hold a hearing on not less than 25 days notice to the debtor, creditors, equity security holders and other parties in interest as provided in Rule 2002 to consider such statement and any objections or modifications thereto. The plan and the disclosure statement *shall* be mailed with the notice of the hearing only to the debtor, trustee, any committee appointed under the Code, the Securities and Exchange Commission and any

party in interest who requests in writing a copy of the statement or plan. Objections to the disclosure statement *shall* be filed with the court and served on the debtor, the trustee, any committee appointed under the Code and such other entity as may be designated by the court, at any time prior to approval of the disclosure statement or by such earlier date as the court may fix.

(Emphasis added). *See* Advisory Committee Note to Bankruptcy Rule 3017 ("[A] hearing would be required in all cases; whether it may be *ex parte* would depend on the circumstances of the case, but a mere absence of objections would not eliminate the need for a hearing ..."). *See also Hearings on H.R. 31 and H.R. 32,* supra note 66, at 1940.

**184.** H.R.Rep. No. 95–595, *supra* note 76, at 292–93.

**185.** *In re Moralez,* 618 F.2d 76, 78, 6 B.C.D. 518 (9th Cir.1980).

commencement of the hearing on confirmation of a Chapter 11 plan.

## CONCLUSION

The reorganization of a Chapter 11 debtor "is primarily an adjustment of human motives and economic conditions, circumscribed rather than determined by the law."[186] In its fundamental sense, it consists of determining who should bear the losses incurred by an unsuccessful business and how the assets of the estate should be apportioned among creditors.[187] Thurman Arnold, writing during the Great Depression, described reorganization in these terms:

A corporate reorganization is a combination of a municipal election, a historical pageant, an antivice crusade, a graduate-school seminar, a judicial proceeding, and a series of horse trades, all rolled into one—thoroughly buttered with learning and frosted with distinguished names. Here the union of law and economics is celebrated by one of the wildest ideological orgies in intellectual history. Men work all night preparing endless documents in answer to other endless documents, which other men read in order to make solemn arguments.[188]

Reorganization involves the "turbulent rivalry"[189] of many interests, shaped by "pressure and negotiation."[190] This emphasis upon negotiation as the central feature of Chapter 11 has been described by one author as follows:

There is a covert message throughout chapter 11, disclosed openly only at vari-ous points of the legislative history: this is a vehicle by which to channel negotiation. Let the parties who have a stake at risk strike their own deal. It is not the business of the law to dictate the conduct of consenting adults behind closed doors.

\*    \*    \*    \*    \*    \*

[O]nly at the request for approval of the disclosure statement and at the confirmation of the approved plan is an appearance before the bankruptcy judge required. Everything else may be resolved by agreement.[191]

■ The plan proposed by First Interstate is not the product of negotiation or cooperation with other parties in interest in an effort to arrive at a constructive solution to the debtors' financial problems. Instead, it is a unilateral attempt to accomplish the same result as conversion to Chapter 7 by other means. This Court is aware that "even a relatively simple disclosure statement can be a very expensive exercise."[192] But in imposing the disclosure requirement Congress made no distinctions between types of Chapter 11 cases; the requirement of a disclosure statement applies to all debtors, large, small, complicated, simple, whether with many or few creditors or classes.[193]

■ The fundamental principle embodied in Section 1125(b) is sound and practicable. Congress created a mechanism to promote effective creditor involvement in which adequately informed creditors decide on a plan of reorganization. Under the Code there is no initial hearing on the plan.

186. A. Dewing, *supra,* note 4, at 1236. One commentator noted "[w]hile it is uncertain how much effect legal theory has in hammering out reorganization plans, there can be no doubt that theory tends to limit the area within which the negotiation of reorganization settlements takes place." Blum, *The "New Directions" for Priority Rights in Bankruptcy Reorganizations,* 67 Harv. L.Rev. 1367 (1954).

187. *Hearings on S. 2266 and H.R. 8200, supra,* note 149, at 621.

188. T. Arnold, THE FOLKLORE OF CAPITALISM 230 (1937).

189. *In re Alyucan Interstate Corp.,* 12 B.R. 803, 806, 7 B.C.D. 1123, 1124 (Bkrtcy.D.Utah 1981).

190. *The Law and Language of Corporate Reorganization, supra* note 117, at 587.

191. R. Aaron, BANKRUPTCY LAW FUNDAMENTALS § 12.01, at 12-2 (1985).

192. *Chapter 11 of the Bankruptcy Code, supra* note 173.

193. *Matter of Northwest Recreational Activities, Inc.,* 8 B.R. 10, 12, 7 B.C.D. 98, Bankr.L.Rep. (CCH) ¶ 67,860 (Bkrtcy.N.D.Ga.1980).

The Court is not required to determine if a plan should be submitted to creditors. Instead, there is a hearing on the adequacy of the disclosure statement.[194] The function of a disclosure statement is to place upon the plan proponent the responsibility of providing parties entitled to vote with adequate information.[195]

"The legislative pendulum has oscillated from one theory to another as the imperfections of each were experienced in succession, and the pendulum will go on swinging...."[196] The shift to the concept of disclosure of "adequate information" was a compromise between the paternalism of Chapter X and "the near absolute freedom" from disclosure in Chapter XI.[197] The disclosure, solicitation and voting requirements of the Bankruptcy Code are a streamlined and highly simplified procedure for business reorganization. The opportunity for parties in interest to appear and effectively express a dissenting voice would be drastically diminished if these minimal creditor protections were ignored.

Accordingly, confirmation of First Interstate's plan of reorganization shall be denied. The Court shall enter an order in accordance with the foregoing.

---

**194.** *In re Forrest Hills Associates, Ltd.,* 18 B.R. 104, 105 (Bkrtcy.D.Del.1982).

**195.** *Matter of Georgetown of Kettering,* 17 B.R. 73, 75 (Bkrtcy.S.D.Ohio 1981).

**196.** *The Revised Bankruptcy Act of 1938, supra* note 59, at 880.

**197.** *See* H.R.Rep. No. 95–595, *supra* note 76, at 228.